New Jersey Department of Labor,
Workmen's Compensation Bureau.

ROSE MATARAZZO, PETITIONER, v. ALDERNEY DAIRY
COMPANY, RESPONDENT.

Decided March 30, 1937.

For the petitioner, *Pesin & Pesin.*

For the respondent, *Cox & Walburg.*

\*      \*      \*      \*      \*      \*      \*

It is alleged in the formal petition that Carmen Matarazzo was an employe of the respondent and while delivering milk on January 27th, 1936, about three-thirty A. M., he slipped in a truck and fell on his spine; that he worked about four days afterward, ceasing employment on February 1st, 1936, and that he died April 18th, 1936, and that his wages were approximately $7 per week.

The respondent denied that the decedent was an employe and denied that the decedent suffered death as the result of an accident arising out of and in the course of employment.

Considerable testimony was introduced on the question of employment. There appeared to be no dispute on the question of dependency as alleged in the petition but there was considerable dispute as to the question of employment and the relationship between the alleged accident and death. It was claimed through the testimony of witnesses to wit, the petitioner herself, and a Mr. Blanke, former driver for the respondent company, that Mr. Blanke had engaged the decedent as a helper on his milk route in Hoboken, paying him $1 a morning or $7 a week, and that the decedent early in

the morning would report to the milk truck in Hoboken, help with deliveries of milk and then return to his home. The driver stated that the company's drivers are allowed to have helpers and that he, in fact, had informed his superiors that he had a helper and no objection was made.

On this point, various witnesses from the respondent testified that the rules and regulations of the company do not permit the hiring of helpers by drivers, although there are some instances, according to the route inspector, Hose, that the drivers do have helpers without the knowledge of the main office.

As to the occurrence of the accident, the driver, Blanke, testified that on January 27th, 1936, just as he and the decedent were starting to make their deliveries, the decedent slipped on the truck and fell to the floor of the truck. The decedent rubbed his back and complained that his back hurt him and later in the morning complained that his head ached. He continued to work on the route that morning and each morning thereafter until February 1st, when Blanke, the driver, was discharged. The petitioner testified that on the morning of January 27th, 1936, the decedent came into the house about eight-thirty after the route was finished and that he looked ill and went into his bedroom where he undressed and she saw that his back seemed to be bruised. She rubbed his back and when he complained of headache, put a cloth on his head and put some mecurochrome on a place on his knee where there was a bruise. He worked the following morning and thereafter until February 1st.

She stated that he began to look different, appeared ill, downhearted and depressed and was restless at night, but that shortly before Easter he procured a job with a firm in New York which made pocketbook frames and worked there approximately three days, leaving his home at six-thirty in the morning and returning five-thirty in the evening. He returned at five-thirty on the evening of April 14th, 1936, very ill and she called the hospital and he was taken to a hospital.

The testimony of Dr. D'Alessio was presented by the petitioner who stated that he saw the decedent at his office on

January 28th, and 30th, 1936. On his physical examination, he found a contusion and bruise in the lumbar region of the back and there were complaints of pain on pressure in the back and complaint of severe headache. He advised the taking of X-rays because of the back condition but the decedent did not have an X-ray taken. When the decedent returned on January 30th, he found the same complaints and gave him some medicine for his headache. The doctor stated that he did not see the decedent thereafter. In answer to a hypothetical question, he stated that the contusion of the lumbar sacral region could have produced a contusion in the cord or membrane in that region and that thereafter a meningitis could have developed.

There was also produced the testimony of Dr. Sirkin who had not examined or even seen the decedent. His testimony was produced either as part of the direct case or rebuttal. In any event, in answer to a hypothetical question, he stated that the accident could have been a predisposing cause of the death from meningitis on the theory that the decedent by reason of the injuries could have been rendered susceptible on contact with the meningitis organism.

On the medical aspects of the case, the respondent produced the hospital records which were placed in evidence. Also the testimony of Dr. Grimes, who was the resident physician at St. Mary's Hospital, where the decedent was a patient from April 14th, to April 18th, was taken. He testified that after a spinal puncture was made, a physical examination made, the spinal fluid analyzed and microscopic examination made, that a diagnosis of cerebro spinal fluid fever or purulent meningicoccus meningitis was made and the regular acute course of the disease followed. The decedent was removed to the infectious disease branch of the hospital and there came under the care of Dr. Kelly. Dr. Grimes testified that the diagnosis was decisive and ruled out any and all other diseases or forms of meningitis as the meningicoccus organism was definitely found. This definitely ruled out tuberculous, pneumococcal, or any other form of meningitis. The doctor stated that this meningicoccus type comes from the particular organism, entering through the nose or throat passages only,

and has an incubation period of from two to eight days. The infection then travels through the blood stream and affects the coverings of the brain. It is an acute, specific, infectious disease and attacks the weak and the strong without favor. The doctor stated that in his opinion, by reason of the incubation period of the particular form of meningitis, and the fact that it attacks individuals without regard to their general physical health, there was absolutely no connection between any injury, especially the injury described by the witnesses, in January, with death from meningicoccus meningitis in April.

The respondent also produced Dr. Harry Kelly, who testified as to his contact with the case at the hospital. He stated that it was definitely determined by a microscopic examination that a meningicoccus organism was the cause of the condition and diagnosed the case as meningicoccus meningitis, an acute, specific, infectious disease. He stated that the organism enters the body through the nose or throat and within approximately two days invades the blood stream and shortly thereafter attacks the brain covering or the meninges. He stated that the incubation period is from two to eight days, so that if an accident occurring January 27th, 1936, were to be the cause of a meningitis, the meningitis symptoms would appear within two to eight days and the course of the meningitis is such that a cure is effected in a short space of time or the disease, within a short space of time, develops into an acute condition often terminating in death. He stated that this type of meningitis is differentiated from the other forms which are caused by other organisms or conditions. He stated in his opinion that there was no relation between the accident in January of 1936 and the death in April of 1936 for the reason that the condition was an acute, specific and infectious disease; because of the fact that the injury described was not of any type sometimes referred to in cases complicated by a meningitis at the time of injury; because the accident of January occurred almost three months previous to the definite symptoms of meningitis, which ruled out conclusively the accident as a predisposing or contributing factor in any way; and finally, the incubation period of the particular

organism is from two to eight days and that, therefore, the organism entered the decedent's system no more than eight days prior to the onset of his illness in April.

The respondent also produced Dr. Blumberg, a neurologist, who testified in general as to meningitis and different classifications and causes. He testified that in his opinion a meningitis of this type is not caused by injury and medically, cannot be caused by injury especially where the alleged injury is at such a remote time from the period when the meningitis developed. He stated that the injury was in no way a contributing or predisposing or causative factor.

I have examined the hospital records and considered carefully the medical testimony and the testimony of all the witnesses presented in this case. I have considered the medical theories advanced on the question of death and its cause and the possible connection with the alleged accident. I have also considered the testimony relative to the question of employment and considered the legal situation presented on that question.

As before stated, it appears that there are two major issues involved in the case, the first issue being the question of employment, the second being whether or not the death was related in any way to the accident of January, 1936. I find it unnecessary to pass upon the first question because after a consideration of all of the exhibits and testimony on the medical aspects of this case, I am satisfied that the petitioner's decedent did not die as a result of an accident arising out of and in the course of employment. It appears that there is no dispute on the question of diagnosis in this case and it appears definitely that the petitioner's decedent died of meningicoccus meningitis sometimes known as cerebro spinal fever and I so find as a fact. There appears to be no argument that this condition is caused by a definite organism and that this organism, aside from an injury causing an opening of the skull exposing the meninges, enters through the nose and throat. The injuries claimed and testified to, of course, in this case are not those of a fractured skull or opening of the skull exposing the meninges and, in fact, it appears from the testimony of the petitioner and Dr. D'Alessio that there was no

laceration or breaking of the skin on any portion of the body and I so find as a fact. In any event, there certainly was no exposure of the meninges. It appears then that this particular organism entered through the nose and throat. It appears also that there is no dispute that the incubation period of this organism is from two to eight days, and that at the time the decedent entered the hospital he was acutely ill. At most, therefore, this organism invaded the system approximately eight days, if not less, before April 14th, 1936. The alleged accident was testified as occurring on January 27th, 1936. The petitioner certainly did not acquire the organism at the time of the accident; and even on the petitioner's theory that there might be a quiescent period, such period is still far shorter than eight or ten weeks, for if it had lasted that long, it would not have been a quiescent period, but a cure. The other medical theory advanced seems to be that the accident caused the decedent to have a lowered resistance and that he, therefore, was predisposed to being attacked by the particular organism. It appears, however, that like infantile paralysis, this particular form of meningitis is no respecter of health or wealth and that there is no connection between the accident of January, 1936, and death in April, 1936, by reason of that theory.

I find as a fact, therefore, that the petitioner's decedent died as a result of a specific, acute, infectious disease known as meningicoccus meningitis, which was in no way connected with the accident of January, 1936, and, therefore, the death of the petitioner's decedent was in no way the result of an accident arising out of and in the course of employment with the respondent.

\*       \*       \*       \*       \*       \*       \*

JOHN C. WEGNER,
*Deputy Commissioner.*